Thomson, P. J.,
delivered the opinion of the court.
This is a controversy between the holders of two trust deeds upon the same property. The facts are as follows : On the 15th day of February, 1892, the plaintiff, John L. Barstow, loaned Judge Wilbur F. Stone $8,000. Barstow was represented in the transaction by Theodore A. Sloane, who looked after the execution of the papers securing the loan. The debt was evidenced by a promissory note for the amount, dated February 15, 1892, signed by Stone, payable to Sloane, and due three years from its date, with interest at’ eight per cent per annum, payable semiannually. Attached to the note as representing the interest, were six *398 interest coupons for $320 each. The note was secured bjr a trust deed, executed by Stone, conveying certain real estate in the city of Pueblo to N. D. Hinsdale, as trustee, with power of sale in the trustee, in case of default in the payment of the principal, or any instalment of the interest. The deed named the clerk and recorder of Pueblo county as successor in trust. The note, shortly after its execution, was indorsed by Sloane, and forwarded, together with the trust deed, which had been duly recorded, to the plaintiff, who lived in the state of, Vermont. As the coupons matured, the plaintiff clipped them off and sent them to Sloane for collection. Sloane collected the first two coupons, and remitted the money to the plaintiff. In the early part of 1893, Stone, being desirous of placing some improvements on the property, and it being necessary, in order to enable him to do so, that he should incumber it for a larger amount, procured Sloane to communicate to the plaintiff his desire to pay off the note. The plaintiff answered the communication by a letter written March 17, 1893, authorizing the submission of a proposition to Stone that if he desired to discharge the loan before the maturity of the note, he should allow him, the plaintiff, a bonus of six months’ interest; saying also, that if Stone should accept the proposition, he, the plaintiff, might want Sloane to reinvest the money for him. It does not appear that any reply was ever returned to the plaintiff’s létter. A short time after receiving this letter, Sloane, in behalf of Judge Stone, applied to Thomas J. Downen, a real estate and loan agent in the city of Pueblo, for a loan of $10,000 on the same property upon which the plaintiff was secured. After some negotiation Downen consented to advance the money, to be secured by a trust deed on the property, provided it was released from the .first trust deed. On the 5th day of May, 1893, Sloane procured the successor in trust named in the plaintiff’s trust deed, O. D. Henderson, the clerk and recorder of Pueblo county, to execute to Stone a deed of release and quitclaim of the property, and placed it on record. This deed recited that the note held by the *399 plaintiff had been fully paid and satisfied by Stone, and that the trustee, Hinsdale, was absent from the state, and unable to act as trustee. Downen thereupon loaned Stone $10,000, taking his note for the amount, dated May 8,1893, due January 1, 1896, with interest from date at eight per cent per annum, and secured by a trust deed to Samuel F. Crawford, conveying the property which had just been released. Sloane gave Stone $2,000 of the money, less a commission of $400 exacted by Downen for making the loan, and converted the remainder to his own use. On the 15th day of August, 1893, Sloane remitted to the plaintiff out of his own funds, the amount of the coupon then due. No further payment of interest was ever made. The plaintiff was kept in ignorance of the transaction with Downen, and first acquired knowledge of it in an investigation which he set on foot when he failed to receive the money on the next coupon. On the 13th day of May, 1893, Downen sold and transferred the note which he had received from Stone to Pope Yeatman. Mr. Yeatman made the purchase in good faith, and without any knowledge whatever of the fraud connected with the release of the former trust deed. The plaintiff, upon becoming conversant with the facts, instituted this proceeding to cancel and annul the release from Henderson, and to foreclose his own trust deed. All the persons connected with both trust deeds were made parties defendant. The lower comt denied him relief, and he appealed to this court.
We have here two men, alike guiltless of bad faith or questionable purpose, one of whom must suffer on account of the rascality of Sloane. If the retention by Sloane of $8,000 of the $10,000 received from Downen, was not a payment of the note held by Barstow, and if the instrument executed by Henderson was, on its face, a valid release, the equities of these two men would be so evenly balanced that we should find considerable difficulty hi deciding between them. Payment of the note would have rendered the security functus officio, and it would have been a matter of no vital importance whether the release was properly executed, or *400 whether there was any formal release at all. In such ease, in the absence of a release by the trustee, a court of equity would order the security satisfied and canceled. But if the note was not paid, then as between Barstow and Yeatman, the question of the validity of the release becomes important.
Stone seems to have thought that the note was paid. For some reason he allowed himself to believe that Sloane had authority from Barstow to receive the money, although the note was not in Sloane’s hands, and he had nothing in writing from Barstow bearing on the subject of its payment, except the letter of March 17, 1893. It is true that the loan had been originally negotiated for Barstow by Sloane, and that the interest had been paid to the latter as agent, the coupons having been forwarded to him for collection; and if after its maturity, the note had been found in Sloane’s hands, Stone would doubtless have been justified in assuming that it also had been sent for collection, and would have been warranted in paying to Sloane the amount due. How far the apparent agency with which Sloane was clothed would have warranted Stone in paying him the money after the maturity of the note, if it was not in his possession, does not require decision in this case. The note was not due, no unpaid instalment of interest was due, and the authority which Stone had the right to believe Sloane possessed, was not an authority to enter into a new arrangement with Stone, whereby the latter would be entitled to pay off the note before its maturity. To enable him to do this would involve the making of a new contract, and, to constitute Sloane an agent for the purpose, the investing of him with a new; authority. Judge Stone understood perfectly the requirements of the situation, and accordingly procured Sloane to correspond with Barstow on the subject of payment of the note. The result was Barstow’s letter of March 17,1893, and whatever authority Sloane had in the premises must be found there. The letter did not empower Sloane to make any contract or arrangement with Stone whatever. It stated that if Stone wished to pay the note he should allow Barstow a *401 bonus of six months’ interest, and then said, “ You can give him my proposition.” The whole authority of Sloane is contained in these words. For any purpose except the submission of the proposition he had no agency. Outside of the letter, he did not even have such appearance of agency as possession of the note might have given him. Whether the proposition was submitted, does not very clearly appear; but the parties proceeded without further communication with Barstow, or advices from him; and the settlement they assumed to make, was not on the basis of the proposition. By its terms there would have been payable the principal of the note, $8,000, with interest from the date of payment of the last coupon, together with a bonus of six months’ interest. This bonus was a consideration demanded by Barstow for permitting a settlement at that time, and would amount to $320. But Sloane retained only $8,000 out of the $10,000. This was the exact principal, so that nothing was withheld for accrued unpaid interest, or bonus. Upon the facts in evidence the court found that the note had not been paid-If the evidence had been conflicting we would have been bound by the finding; but upon the undisputed facts, a different finding would have been error. There was no evidence of fraud or misconduct on the part of Judge Stone. Like some of the others he seems to have reposed undue confidence in Sloane, and like them to have been deceived by him.
We are now to consider how the instrument executed by Henderson, assuming to release the property from Barstow’s trust deed, affected the parties interested. If Yeatman before purchasing the Downen note, had found upon the records a release regular in form, and executed by the trustee himself, a question might arise, as to how far, without actual knowledge by him of any of the facts, his security would be entitled to preference over another outstanding one which had been apparently released. But in view of the character of the instrument under consideration, the circumstances of its execution, and the position occupied by the person who *402 executed it, we think that question is not in the case. The release which was on record was a release, not by the trustee, but by the successor in trust. Yeatman was charged with knowledge of everything which the records disclosed affecting the title, and also with knowledge of its legal effect. Now what was the relation sustained by Henderson to the property? what was the effect of the instrument which he executed? and could it operate as a release at all? To answer these questions it will be necessary to examine the trust deed, which was the source of any possible authority he might possess, and in which his relation to the property was distinctly defined. We shall probably be best understood by quoting in hcee verba the portions of the deed material to the discussion. Those portions are as follows:
“ This Indenture, Made this fifteenth day of February, in the year of our Lord one thousand eight hundred and ninety-two (1892), between Wilber F. Stone, of the county of Arapahoe and state of Colorado, party of the first part, and N. D. Hinsdal.e, trustee, party of the second part.—
“Witnessetli, That whereas, said Wilber F. Stone has executed his one certain promissory note bearing even date herewith, payable to the order of Theodore A. Sloane, three years after the date thereof, for the principal sum of eight thousand dollars, with interest thereon from date until paid at eight per cent per year, payable semi-annually, as evidenced by interest coupons Nos. 1 to 6, inclusive, attached to said note, each for the sum of three hundred and twenty dollars;
“And Whereas, The said Wilber F. Stone is desirous of securing not only the prompt payment of said promissory note, but also of effectually securing and indemnifying the said Theodore A. Sloane for or on account of any assignment, indorsement or guarantee of said promissory note;
“Now, Therefore, The said party of the first part, in consideration of the premises, and for the purposes aforesaid, and in the further consideration of one dollar to him in hand paid by the said party of the second part, the receipt whereof *403 is hereby confessed, has and hereby does grant, bargain, sell and convey unto the said party of the second part, his heirs, assigns and successors in trust forever, all the premises situate in the county of Pueblo, state of Colorado, known and described as follows, to wit: * * *
“ To Have and to hold the same, together with all and singular the privileges and appurtenances thereunto belonging— .
“ In trust, nevertheless, that in case of default in the payment of said note, or any part thereof, or interest, according to the tenor and effect of said note, then it shall and may be lawful for said party of the second part, his heirs, assigns or successors in trust, to sell and dispose of the said premises and all the right, title, benefit and equity of redemption of the said party of the first part, his heirs or assigns therein, at public auction, at the east front door of the court house in the city of Pueblo, in the state of Colorado, for the highest and best price the same will bring in cash, thirty (30) days’ public notice having been previously given of the time of such sale by advertisement in one of the newspapers at the time published in said county, and to make, execute and deliver to the purchaser or purchasers at such sale good and sufficient deed or deeds of conveyance for the premises sold. * * *
“ And it is further agreed and especially understood that in case of death, resignation or removal from the county of Pueblo, or the failure to act, or other inability of said party of the second party, then the clerk and recorder of Pueblo county, Colorado, shall be and hereby is appointed and made successor in trust herein, with like power and authority as the said party of the second part, and the said premises shall become vested'in such new trustee accordingly.”
This deed conveyed the property to Hinsdale in trust, and clothed him with a power, dependent upon a future contingency, to perform certain acts in connection with the property conveyed. We shall first consider the nature and extent of this power, and, at the same time, the title which the trustee *404 took and its relationship to the power; and .then ascertain how, and under what circumstances, the title and the power could pass to the successor in trust.
The power of a trustee under a deed of trust is ereated by contract. There can be no valid execution of the power except hr strict accordance with the terms of the instrument creating it. Perry on Trusts (4th ed.), §§ 602g and 783; Equitable Trust Co. v. Fisher, 106 Ill. 189. Referring to the trust deed in hand, we find that Hinsdale was empowered, in case of default in the payment of the note when it should mature, or of any instalment of interest when it.should become due, to advertise and sell the land. • Until there should be such default he had no power to act; and anything which he might attempt to do in the way of an execution of the power, in the nonexistence of any condition of its exercise, would be a nullity. The deed vested in him the legal title to the land. This title was placed in him for the purpose of enabling him to exercise the power; but he might transfer it at any time without executing the power. The grantee would, of course, take only the title which he had; but his deed, no matter when, or for what purpose, made, would divest him of his title. Stephens v. Clay, 17 Colo. 489.
What is known as a deed of release, is nothing but the conveyance back of the legal title, standing in the name of the trustee, to the owner of the equity. It is not the execution of a power. When the debt is paid the power is extinguished ; there is no longer a power to execute; and the title remains in the trustee, until he passes it by a release, for the benefit of the owner of the estate. Perry on Trusts, § 602i; Penny v. Cook, 19 Iowa, 538. It is by virtue of the title which was placed in him, and not by virtue of the power with which he was invested, that his release, after payment, is effective in discharging the incumbrance; and it would be as inaccurate to say that the release is the execution of a power, as to say that the conveyance of land by an individual, in the course of an ordinary business transaction, is the execution of a power.
*405 We come now to an examination of the standing of the successor in trust, by whom the instrument in question was executed. His authority, like that of the trustee, must be found in the deed of trust; and the validity of the instrument he executed depends on the existence of conditions, set forth in the deed, upon which a substitution of the successor for the trustee could take place. Referring to the deed we find that the legal title was conveyed to the trustee, and a certain specified authority conferred upon him; but that in the event of his death, resignation, removal from the county, or failure or inability to act, his title and authority would vest in his successor. Until the happening of some one of the events provided against, the successor would have no title, and' no authority. He would remain a stranger to the deed. The word “removal,” as it is used in the deed, contemplates a change of domicile. The absence of a party from-his home, for temporary purposes of business or pleasure, is not'a removal. When the release was made, Hinsdale had not died, had not resigned, and, as the evidence clearly shows, had not removed. No title therefore vested in Henderson by reason of the death, resignation or removal of Hinsdale. The only other contingency upon which any title could descend to Henderson, would be the failure or inability of Hinsdale to act. To act how ? The deed must furnish the answer to this question. The language used is part of the deed; it is dependent for its meaning on what precedes it; and manifestly, it has reference to the action which the deedj by its terms, empowered the trustee to take. The only action of the trustee, provided for in the deed, consisted in the advertisement and sale of the property; and he could not take that action until some instalment of interest had become due, and remained unpaid; or, if the interest was regularly and punctually paid, until the note had matured, and default had been made in its payment. Until such time should come, there was nothing which the trustee by virtue of the authority conferred upon him by the deed could do, and he was as powerless as a stranger. It would involve an *406 absurdity to say that he failed to act, or was unable to act, before the period when any action could possibly be taken, had arrived.
In this case the instalment of interest due February 15, 1893, had been paid; the next would not become due until August 15, 1893; the note would not mature until February 15, 1895; but the release was made on the 5th day of May, 1893. There was therefore no default in the payment of either interest or principal, and consequently no action to be taken by the trustee. His absence at that time was a matter of no significance. If the power could have been executed, and its execution was demanded, as no man can act except where he is, we may concede for present purposes that the absence of the trustee would have amounted to inability to act; but as at that time there was no act, authorized by the deed, which could legally be done, there was not on his part an inability to act, or a failure to act, within the meaning of the deed. When Henderson assumed to release the property, no condition upon which the title could vest in him, had come into existence; he therefore had no title, and could convey none; and the instrument which he executed was not a release. The land is still held by Bar-stow’s trust deed, and that of Yeatman is subject to it.
No question of superiority of equity, on one side or the other, is raised by this record. Nothing is involved but the legal character of the instrument by which it was assumed to remove the incumbrance in favor of Barstow from the land; and as that instrument was ineffective for any purpose, the plaintiff’s trust deed remains a prior lien, and he is entitled to the relief he seeks.
The judgment will be reversed and the district court instructed, in such further proceedings as may be had in the cause, to conform to this opinion.

Reversed.