Wilson, J.
This action was brought to restrain a sale of real estate under a deed of trust, and also for the cancellation of the trust deed, of the note to secure which it was given, and of an agreement extending the time of payment of the note, under a plea of payment. It appears that in July, 1887, one Charles T. Snyder applied to H. J. Aldrich, president and manager of the Colorado Securities Company, doing business at Denver, Colorado, to obtain for him a loan of $3,000 for the period of five years, to be secured by deed of trust upon his ranch of 320 acres in Park county, Colorado. Aldrich applied to the Wilson & Toms Investment Company, of St. Louis, Missouri, and this company found in Daniel Steele, one of their clients, a citizen of Massachusetts, and one of the defendants, a person who was willing to make the loan. Thereupon the note, the deed of trust, and coupon interest notes were prepared, the money transmitted by Mr. Steele to the investment company, and by it to Snyder through the Colorado Securities Company. The principal note and each of the coupon notes were dated at St. Louis and were expressed upon their face to be payable to defendant Steele, at the office of the investment company in St. Louis. By a separate agreement in writing, the Colorado Securities Company guaranteed the payment of the note and interest. Subsequently, and before the maturity of the note, the title to *353 the ranch became vested in Mrs. S. Emma Snyder, the wife of the original payor. The interest seems to have been paid regularly. The securities company seems to have generally given notice when this was due, and upon receiving payment, forwarded it to the investment company, or to the Central Trust Company, which became the successor to the Wilson & Toms Investment Company, and by this company it was transmitted to Mr. Steele, who then returned the coupon note so paid to the trust company, and it was by this company returned to the payor through the securities company. The principal note was due August 1, 1892. Shortly before its maturity, Mrs. Snyder applied to Aldrich to know if she could secure an extension of the note for the period of five years, and employed Aldrich to secure such extension. Her language in reference to this as set forth in her testimony was as follows: “ When I asked for an extension of this loan, I employed Mr. Aldrich to get it. I asked him whether it could be extended, and he said he did not know, he thought so. Audi said to him, ‘ I supposed it was altogether as you say,’ and he said, ‘No, he would have to consult some Eastern party.’ ” Aldrich communicated the desire of Mrs. Snyder for an extension to the trust company at St. Louis, and it to Mr. Steele, who consented upon condition that $500 of the principal be paid, and that Mrs. Snyder agree to keep the loan for another five years, to wit, from August 1, 1892, to August 1, 1897. Thereupon the following extension agreement was drawn up, and signed by Mrs. Snyder.
“EXTENSION AGREEMENT AND COUPONS.
“ St. Louis, Mo., July 28, 1892.
“ Whereas, Daniel Steele has agreed to extend the time for the payment of a loan of $2,500, secured by a trust deed made and executed by Charles T. Snyder, dated July 15, 1887, and by the terms thereof due August 1, 1892, for the term of five years; now, in consideration of such extension I hereby agree to keep said loan for the term of five years from August 1, 1892, and- further agree to pay interest on the *354 principal of said debt according to the tenor and effect of certain extension coupon notes, signed by me, of even date herewith, and in case'of any default in payment of interest, or in case of non-payment of taxes assessed on the mortgaged premises, or of a breach of any of the covenants in said trust deed contained, it shall be optional with said mortgagee to declare the principal of said debt immediately due and payable, and the same may be collected according to the terms and conditions of the said trust deed and principal note, time being the essence of this contract for extension.
(Signed) “ S. Emma Snyder.”
By whom this agreement was drawn does not appear from the evidence, but it was presented to Mrs. Snyder by Aldrich, and upon being signed, was transmitted by him to the trust Company at St. Lo.uis, together with the $500 to be paid on the principal, and by this company both were transmitted to defendant Steele. At the same time, coupon interest notes for the extended time were signed by Mrs. Snyder, and transmitted with the agreement. All these were payable to Daniel Steele, and at the office of the Central Trust Company in St. Louis. For his services in securing this extension, Mrs. Snyder paid to Aldrich $250. About December 28, 1893, Mrs. Snyder through Aldrich negotiated the sale of 140 acres of the ranch property to Mrs. Lydia L.'Cowell. On the same date, the Colorado Securities Company executed to Mrs. Cowell its agreement in writing as follows:
“ (Letterhead of The Colorado Securities Co.)
“ Denver, Colo., December 28,1893.
“ In consideration of the payment of $500 to be applied on a loan of $2,500 given by Mrs. S. Emma Snyder and secured upon land in Park county, we hereby agree with Mrs. Lydia L. Cowell that upon the payment by her of $1,800 in addition to the above named $500 together with accrued interest, on the full amount to the date of payment, that we will release from our deed of trust the land purchased by her from Mrs. S. Emma Snyder as described in a deed held by us and executed *355 by Mrs. S. Emma Snyder conveying said land to said Lydia L. Cowell. Said above named payments to be made within ninety days from date of this agreement.
(Sgd.) ■ “ The Colorado Securities Co.,
“ By H. J. Aldrich, Pt.”
About this time, there is some evidence of an application by Aldrich to the trust company to secure a release from the deed of trust of 150 acres of land, presumably that sold to Mrs. Cowell, and the substitution of another and similar loan, to be secured upon the remainder of the land. The trust company wrote him in reply that if he would forward her new application, they would submit the entire matter to their client, Mr. Steele, who held the present loan, and would arrange with him, if possible, to do so. This seems to have gone no further, however, and it does not appear from the record that the proposition was ever submitted to Mr. Steele. Aldrich continued to collect from Mrs. Cowell the money due upon her purchase, and Mrs. Snyder says that it was her understanding that this money was to be applied upon the payment of the Steele note. No part of it, however, was ever so applied. In 1894, Charles M. Snyder, plaintiff in the case, became the owner of the ranch by deed from his mother, Mrs. S. Emma Snyder. In February, 1896, default having been made in the payment of the interest coupon notes, due on the first day of the month, and on the first day of August previous, Mr. Steele as was provided in the deed of trust declared the whole of the indebtedness due and payable, and directed the trustee, defendant Lester, to sell the property. Thereupon, this suit was instituted. There is no pretense or claim that any payment was ever made directly to Steele. All of the payments contended for by the plaintiff were the collections made by Aldrich, growing out of the sale of part of the land to Mrs. Cowell. The whole controversy, then, hinges upon the question as to whether or not Aldrich was the authorized agent to receive such payments so as to charge the principal, Steele. Upon the trial, the court called a jury *356 for advisory purposes, and submitted to it this question of agency, and it was found in favor of plaintiff’s contention. There was no evidence adduced showing or tending to show that Aldrich or the securities company was appointed by Steele as his agent, or authorized by him to collect or receive any payments of this loan. The questions then to be determined are whether or not the acts of Steele in connection with those of the securities company and Aldrich were such as to create an implied agency, and to estop Steele from pleading that he was not. Under the circumstances of this case, we think that the court erred in submitting the question of agency to a jury. The' facts which it is claimed created the agency in this case were undisputed, and it therefore became a question of law solely for the court to determine upon the conceded facts. There was no dispute nor conflict of evidence for the jury to weigh and determine. Mechem on Agency, § 105. As the jury in this case was called for advisory purposes only, however, and its verdict could be disregarded by the court if it so desired, this of itself would not be sufficient to justify the reversal of the judgment. If the facts were sufficient in law to create an agency, the judgment must be sustained, notwithstanding the question should not have been submitted to the jury.
In the determination of the question as to whether or not an agency existed in the circumstances of this case, there are certain fundamental and well established principles bearing upon the doctrine of agency which must be borne in mind. They are thus tersely and aptly stated by Mr. Mechem: “ Among these are, as has been seen, that the law indulges in no bare presumptions that an agency exists, — it must be proved or presumed from facts ; that the agent cannot establish his own authority, either by his representations or by assuming to exercise it; that the authority cannot be established by mere rumor or general reputation; that even a general authority is not an unlimited one, and that every authority must find its ultimate source in some act of the principal. Persons dealing with an assumed agent, therefore, whether *357 the assumed agency be a general or a special one, are bound at their peril to ascertain, not only the fact of the agency, but the extent of the authority, and in case either is controverted, the .burden of proof is upon them to establish it.”
Applying these principles, it is clear that in whatever light the acts of the parties may be viewed, there was an entire failure to establish any authority or agency, either express or implied, on the part of Aldrich or the securities company to receive payment of the principal or any part of it, of the Snyder loan. Mr. Steele was at all times in possession of all of the securities representing the loan, and at no time does it appear from the evidence that- he ever intrusted them or any of them, to Aldrich or the securities company, or even to the Central Trust Company. We may concede, although even that is not established by the evidence, that Aldrich was the agent of Steele to collect the interest, but that would not authorize him to collect the principal, and payment to him of such principal would not discharge the liability of the maker to the payee. Mechem on Agency, § 379; Smith v. Kidd, 68 N. Y. 130. We might even go further, and admit it to have been shown by the evidence, which it was not, that Aldrich was under the circumstances of the case the general agent of Steele, authorized to receive the payment of the principal when due, but even then he would have no authority to receive payment before maturity, so as to bind the payee. It will be remembered that the principal of this note under the extension agreement did not mature until August 1, 1897, and the pretended payments to Aldrich were received by him about the beginning of the year 1896, more than eighteen months prior to maturity, and whilst he was not in possession of a single security, either the deed of trust, the note, the extension agreement, or the interest coupon notes. The party who makes payment under such circumstances as these, must do so at his peril.
The views here expressed are not only in accordance with elementary principles, but are abundantly supported by authority. We deem it necessary to cite only a few cases, and *358 those only of recent date. Barstow v. Stone, 10 Colo. App. 396; Weldon v. Tollman, 67 Fed. Rep. 987; Richards v. Waller, 49 Neb. 639; Joy et al. v. Vance et al., 104 Mich. 97 ; Bromley v. Lathrop, 105 Mich. 493; Trowbridge et al. v. Ross et al,, 105 Mich. 599. The facts in the three Michigan cases are very similar to those of the case at bar, and the circumstances are even stronger to show an agency, but in each the court held that the payment was unauthorized, and could not destroy the obligation of the payor. In Bromley v. Lathrop, supra, the holder of the mortgage note had for eight years received payment of the interest coupon notes through a mortgage company, which afterward undertook to receive payment of the principal. There had also, as in this case, been an extension of time on the mortgage. The mortgage company itself had entered into the extension agreement with the mortgagor, and had taken from him interest coupon notes, payable to itself, representing the interest to mature during the extended time. This was done without the knowledge or authority of the holder of the note, but when informed of it by the mortgage company, he acceded to the agreement of extension, recognized and ratified the action of the company, and accepted from it the interest coupon notes which it had taken. Interest was paid as before through the mortgage company, which usually notified the debtor when it was due. When the principal note matured, notice of the fact was given by the company to the payor, and he made full payment to the company. The holder of the note never received it, and the mortgage conqpany becoming bankrupt, the question was, as in this case, upon whom the loss should fall, whether upon the holder of the mortgage note or upon the payor. The court in its opinion said: “ As before stated, the fact that the interest was collected from time to time by the Michigan Mortgage Company was not sufficient to justify an inference of authority to receive payment without the surrender of the securities. We think the complainant had the same right to assume that the defendant (the mortgagor) was treating the Michigan Mortgage Company as his agent, as *359 defendant had to assume that the company represented complainant.”
The evidence in this case, if it tends to show agency at all on the part of Aldrich, establishes the fact that he was an agent for the Snyders only. It is true that the Snyders paid 'to him the $500 which was to be credited on the original note before Steele would agree to the extension for five years, but in this he was professedly and actually acting as an agent for Mrs. Snyder, and received from her $250 as compensation for his services in this respect. This, too, was not a collection on the principal, because it was paid before maturity, and was paid in accordance with the terms of a new and an independent contract, and besides, there is no evidence that Steele ever knew that this payment was transmitted through Aldrich, or that he had anything to do with its receipt. Steele looked alone to the Central Trust Company. Even the demand by Aldrich for the payment of the interest coupon notes, and his transmittal of the money when received to the trust company for the holder of the note, did not constitute him Steele’s agent to receive this money. He was interested in the payment, because his company had expressly guaranteed the payment of the note and interest.
The question of ratification does not arise in this case, because ratification presupposes knowledge of the act claimed to be ratified, and there is not the slightest evidence that Steele had any knowledge during these transactions of Aldrich’s assuming to represent him, or of any payments to, or collections by Aldrich, on account of the Snyder loan, until the institution of tins suit.
The whole history of the case shows an unfortunate reliance by Mrs. Snyder upon Aldrich, regardless of all business precautions, and that she has thus become the victim of her misplaced confidence. It is hard, of course, that one of two parties, both equally innocent and honest, must suffer from the rascality of a third, but after a careful and thorough examination of the evidence, we can discover no act of the defendant Steele which should estop him from asserting his right *360 to the payment of this loan. He has clone nothing of which the plaintiff can in law or justice complain. Mrs. Snyder had full actual knowledge that Daniel Steele was the owner and holder of the deed of trust and of the note secured thereby, and if without the production of either she undertook to pay the principal before maturity to a third party, she did so at her own risk. As to the authority of such party, she could easily have protected herself by demanding the surrender of the note, or the production by Aldrich of some authority from Steele, whom she knew to be the owner of the note, to receive its payment. For the lack of such ordinary caution, Steele ■who was entirely innocent and who had wisely done all he could to protect himself by retaining all of the securities in his own possession, should not be held responsible, nor made to suffer.
Plaintiff insists, however, that the evidence showed the Central Trust Company to be the general agent of the defendant Steele, and that the securities company was employed by it as a subagent, and was therefore invested with authority in the premises, and that Steele was bound thereby. It is not necessary to review the evidence in respect to this claim. It is sufficient to say that it does not support the contention. The evidence does not show that the Central Trust Company was the agent of Steele, authorized to receive and collect the principal of this note either before or at maturity, and certainly upon no principle could it be contended that it could invest a subagent with more authority than itself possessed.
Plaintiff also urges that these controverted questions were found in his favor by a jury, and that its verdict is final and should, not be disturbed by a court of review. There are several reasons why this rule does not apply to this case. First, as we have before stated, the facts which it is claimed created an agency were undisputed, and the question was therefore one of law for the court, and not of fact for the jury. Secondly, there was no conflict of evidence; there was none to support the verdict. Thirdly, this is a suit in equity, and appellate courts will exercise great latitude in considering evi *361 denee received in support of equitable issues involved, even though submitted to a jury. Tabor v. Sullivan, 12 Colo. 141.
There are several other questions raised and presented for our consideration, but it is unnecessary to discuss theili, as the one which we have determined is decisive of the appeal. Upon the case presented, a decree should have been rendered in favor of the defendants. The judgment will therefore be reversed.

jReversed.