L. C. GRIFFIN, Appellant, v. C. E. ERSKINE, C. F. ADREWS, receiver of the CORNING STATE SAVINGS BANK.

**Payments.** Payment by a debtor to one authorized to collect the 1 same is a satisfaction of the debt regardless of what subsequently becomes of the amount paid.

**Abbreviations:** JUDICIAL NOTICE: PAROL PROOF. The abbreviation 2 " Pres." is of such common use that when affixed to the name of an officer of a bank courts will take judicial notice that it designates the president; and oral evidence that the abbreviation " Pt." has the same significance is competent.

**Banks and banking:** AUTHORITY OF OFFICER. The authority which 3 the president of a bank may exercise in its behalf, when his duties are not specifically defined by its board of directors, articles or by-laws, may be established by long acquiescence by the bank in his performance of certain acts.

**Same:** LIABILITY OF BANK. Where it appears that the president 4 of a bank in his official capacity conducted the making and transfer of commercial paper his acts in relation thereto are binding upon the bank; and this rule has been declared by statute in the enactment of the negotiable instrument law by the 29th General Assembly.

**Payment:** AUTHORITY OF AGENT TO ACCEPT DRAFT OR CHECK. An agent 5 entrusted with the collection of a debt may receive a draft or

check as conditional payment, unless instructed to the contrary, where he has good reason to believe that the same will be cashed in the due course of business, and when so cashed it amounts to payment of the debt.

**Appeal:** QUESTION NOT RAISED BELOW. Where a bank, entrusted with the collection of a mortgage debt for another, demands and receives the interest from a subsequent purchaser of the land who assumed and agreed to pay the debt, the mortgagee cannot, for the first time on appeal, raise the question of the purchaser's interest in the premises as effecting his right to discharge the whole debt.

*Appeal from Adams District Court,*— Hon. W. E. MILLER, Judge.

MONDAY, SEPTEMBER 24, 1906.

SUIT for the surrender and cancellation of a certain bond and mortgage. The petition was dismissed, and plaintiff appeals.— *Reversed.*

*Davis & Wells,* for appellant.

*T. M. Kearney, W. D. Thompson,* and *Maxwell & Maxwell,* for appellee C. E. Erskine. *Maxwell & Maxwell,* for appellee C. F. Andrews.

LADD, J.— One J. H. Ramsey executed to the defend ant C. E. Erskine a bond for the payment of $1,800, dated February 1, 1899, payable in five years, with interest at the rate of 5 per cent. per annum, evidenced by coupons attached to the bond, and secured by a mortgage on one hundred and twenty acres of land in Adams county. The bond and coupons were made payable at the Corning State Savings Bank at Corning, Iowa. In October, 1900, S. H. Manatrey, as owner of this land executed a contract of sale thereof to the plaintiff, in which the latter expressly assumed and agreed to pay the above mortgage. In July, 1903, plaintiff entered into a contract of sale to D. J. Gibbons, in

which the latter promised to make different payments, among them one of $1,800 February 1, 1904. The sole issue to be determined is whether the above bond has been paid.

Prior to the last-mentioned date Erskine, who resided in Wisconsin, transmitted the papers to the Corning State Savings Bank, " with directions and special authority to collect the amount due and to remit the proceeds " to him, and these remained there until the failure of the bank and Andrew's appointment as receiver on the 22d of that month. On January 26, 1904, the plaintiff remitted a draft of $90, in payment of the last interest coupon, to the bank, and this was acknowledged by " W. H. Clark, Cashier," who added: " How about the principal, which is also due, 2-1-04 ? " Clark was then cashier and Frank L. La Rue president of the bank. Negotiations with the latter for a new loan having failed, the Cromwell Savings Bank, through its cashier, and acting for plaintiff, transmitted a draft for $1,800 issued by it on the Bankers' National Bank, Chicago, Ill., to " Frank La Rue, Pt.," accompanied by the following letter: " Cromwell, Iowa, Jan. 30, 1904. Mr. Frank La Rue, Corning, Iowa — Dear Sir: Enclosed you will find a draft for $1,800 to pay off the Ramsey loan. The parties could not stand so steep interest as you wrote about. Yours respectfully, E. N. Dougherty." This letter was subsequently returned to the Cromwell Savings Bank, with reply written on the bottom: " Received above amount and will send for papers to-day. Am sorry we could not give your customers a better rate. Yours truly, F. L. La Rue, Pres." This draft was indorsed: " Pay to order of the Security Trust & Savings Bank, Des Moines, Iowa. Frank La Rue, Pt." and sent to the Security Trust & Savings Bank of Des Moines accompanied with this letter: " January, 30, 1904. D. G. Edmundson, President — Dear Sir: Herewith find drafts aggregating $5,285 to cover W. O. Mitchell loan. Kindly send me all papers,

including release. We have the abstract. Yours truly, F. L. La Rue, Pres." The draft was subsequently paid through the Chicago clearing house and returned satisfied. No entry concerning it was entered in the books of the bank. La Rue, though president of the bank, was intrusted by the directors with its management, and exercised control over all of its affairs. He uniformly procured its mail from the post office and opened all letters received, issued all drafts, and indorsed all those received as well as bills receivable generally. In other words, though Clark was cashier, La Rue performed the duties of that office. It was the custom of each to sign his name with title of president or cashier, as the case might be, rather than to write out the name of the bank and add by himself as such officer. All farm loans were drawn to F. L. La Rue, president, and a large portion of the drafts received were payable to him as such. Indeed, much of the business of the bank appears to have been transacted in his name as president, instead of that of the bank. It was also shown that many banks in making remittances to other banks customarily make them to the president or the cashier of the latter, instead of to the bank by name, and that " Pt." or " Pres." after the name was commonly employed to signify " president." That this draft reached La Rue and was subsequently paid is not questioned.

Practically the only issue presented is whether La Rue in receiving it should be held to have been acting in behalf of the bank. As the answer admits that the bank was authorized to collect the amount due on the bond, there is no occasion for following the appellee into a discussion of what may be essential to prove such agency. Payment to the bank as Erskine's agent, if made, satisfied the debt, regardless of what subsequently became of the money or papers. *Stuart v. Stonebraker,* 63 Neb. 554 (88 N. W. 653); *Pochin v. Knoebel,* 63 Neb. 768 (89 N. W. 264.)

1. PAYMENT.

Nor is the suggestion that the Cromwell Bank undertook to delegate to La Rue the duty of paying the Corning Bank entitled to weight. Such is not the inference to be drawn from Dougherty's letter, and certainly La Rue did not so regard it, for he acknowledged it in his capacity as president of the bank. Moreover, the draft was made payable to him as president, and he so indorsed it. The evidence that " Pt." or " Pres." annexed to the name of the payee in a draft is commonly understood to be an abbreviation for " president " was undisputed. The abbreviation of " Pres." for " president " is in such common use that the courts will take judicial notice of its meaning. *Heaton v. Ainley,* 108 Iowa, 112. See *Sumner v. Mitchell,* 29 Fla. 179 (10 South, 562, 30 Am. St. Rep. 106, 14 L. R. A. 815), and note; *Power v. Bowdle,* 3 N. D. 107 (54 N. W. 404, 21 L. R. A. 328, 44 Am. St. Rep. 511) ; *Dages v. Brake,* 125 Mich. 64 (83 N. W. 1039, 84 Am. St. Rep. 557) ; *Estate of Lakemeyer,* 135 Cal. 28 (66 Pac. 961, 87 Am. St. Rep. 96). And we think evidence that " Pt." was so understood among bankers was competent as tending to explain what was intended. *Lacy v. Dubuque Lumber Co.,* 43 Iowa, 510 ; *Small v. Elliott,* 12 S. D. 570 (82 N. W. 92, 76 Am. St. Rep. 630) ; Greenleaf on Evidence, 282 ; 1 Am. & Eng. Ency. of Law; *New England Dressed M. & W. Co. v. Standard Worsted Co.,* 165 Mass. 328 (43 N. E. 112, 52 Am. St. Rep. 516) ; Dages v. Brake, *supra.* Written in a draft following the name of the president of a bank the letters were suggestive of his official position, but, as they do not seem to be commonly employed as indicating " president," parol proof was admissible.

2. ABBREVIATIONS: judicial notice: parol proof.

Ordinarily the cashier of a bank is its managing officer, and the powers of the president as such are very limited, save as conferred on him by the board of directors. Morse on Banks, section 144. Neither the articles of incorporation nor the by-laws of the bank are to be found in the record,

and the duties of the officers of a state bank are not defined
by statute.    Necessarily, then, we must resort
3. BANKS AND      to other evidence of the authority he might
BANKING:
authority of      exercise in behalf of the bank.    Section 1866
officers.
of the Code directs that a state bank
shall be managed by its board of directors, and the evidence
that the entire management of this bank was intrusted by
the directors to La Rue is undisputed.    For five or six
years prior to the time in question he had been in complete
control, had received all its mail from the post office, and
indorsed all of its drafts.    Even though not expressly em-
powered to perform these acts, the performance for so long
a time indicated that the practice had been fully acquiesced
in by the board.    In the work on Banking cited, Mr. Morse
observes that " the cases, though largely occupied in decid-
ing that a president has no authority by virtue of his office,
yet hold the bank bound by his action wherever the charter,
or a vote of the directors, or usage of the bank, or long
acquiescence by the bank in a course of action by the presi-
dent, or any facts constituting a holding out of the president
by the bank as having a right to act for it, lay a founda-
tion for authority actual or inferred, and whenever the bank
has ratified his action."    *Sherwood v. Home Savings Bank*
(decided at the present session) 109 N. W. 9.    See *First
National Bank v. New,* 146 Ind. Sup. 411 (45 N. E. 597);
*Bell v. Hanover National Bank* (C. C.) 57 Fed. 821;
*Smith v. Lawson,* 18 W. Va. 212, (41 Am. Rep. 688);
*U. S. National Bank v. First National Bank,* 79 Fed. 296,
(24 C. C. A. 597.)

Having authority to act for the bank in all matters in
controversy, it is unnecessary to inquire concerning the
extent of the inherent power pertaining to the office of presi-
dent.    Nor, in view of the authorities cited,
4. SAME: liability   is it necessary to discuss whether the evidence
of bank.
that greater powers had been conferred on
and customarily exercised by La Rue was admissible.    As

indicated by the correspondence, La Rue received the draft in the ordinary course of mail. Did he do so in behalf of the bank? The evidence was to the effect that the large portion of remittances of the bank were drawn to La Rue as president. This may have been owing, as suggested by one witness, to the fact that he was better known than the bank of which he was president. · That the business of the bank was conducted largely in the name of its officers as such, instead of the name of the bank, is fully established, and the evidence indicated that the form of remittance was that customarily adopted by many banks in drawing drafts in favor of other banks. Says Mr. Randolph in his work on Commercial Paper, vol. 1, section 157: " The office of cashier and the cashier's official name have, by common usage of banks in the making and transfer of commercial paper, become synonymous with the bank itself. . . . And it is not necessary. that the bank be named in the instrument, but like effect will be given to. a bill or note payable to ' A. B., Cashier,' or to ' A. B., Cas.'; parol evidence being admitted to show ' cashier ' intended." That such a draft in favor of a cashier and indorsed by him as such is binding on the bank appears from many authorities. *Bank of Genesee v. Patchin Bank,* 19 N. Y. 312; *Bank of N. Y. v. Muckingum Branch of Bank,* 29 N. Y. 619; *First National Bank v. Hall,* 44 N. Y. 395 (4 Am. Rep. 698); *Folger v. Chase,* 18 Pick (Mass.) 63; *Barney v. Newcombe,* 9 Cush. (Mass.) 46; *Lookout Bank v. Aull,* 93 Tenn. 645 (27 S. W. 1014, 42 Am. St. Rep. 934); *Farmers', etc., Bank v. Troy City Bank,* 1 Doug. (Mich.) 457; *Garton v. Union City National Bank,* 34 Mich. 279; *Prat v. Topeka Bank,* 12 Kan. 570. See *Baldwin v. Bank of Newbury,* 68 U. S. 234 (17 L. Ed. 534).

As La Rue was discharging the duties . ordinarily exacted from the cashier, these decisions are in point. Regardless of these considerations however, the entire question has been settled in this state by the enactment of the nego-

tiable instrument law by the 29th General Assembly (chapter 130, section 42), providing that "where an instrument is drawn or indorsed to a person, as 'cashier' or other fiscal officer of a bank or corporation, it is deemed *prima facie* to be payable to the bank or corporation of which he is such officer; and may be negotiated by either the indorsement of the bank or corporation, or the indorsement of the officer." There is nothing in this record to overcome the presumption raised by this statute that the draft was payable to the bank of which La Rue was president. It came into his hands as such officer authorized to receive it for the bank, and therefore reached the bank, the agent authorized by Erskine to collect the money.

But did the delivery of this draft to the bank constitute payment? The rule universally accepted is that under authority merely to collect, an agent, in the absence of a custom to the contrary, may receive nothing except money in payment. A debtor who owes money, in paying to an agent, must do so in such a manner as to facilitate the agent in transmitting money to his principal. *Graydon v. Patterson,* 13 Iowa, 256; *Farwell v. Salpaugh,* 32 Iowa, 582; *Drain v. Doggett,* 41 Iowa, 682. Even though the creditor himself take the debtor's note the payment, in the absence of an agreement to the contrary, is regarded in this state as conditional only. *Kephart v. Butcher,* 17 Iowa, 240; *McLaren v. Hall,* 26 Iowa, 297. In other words, bills payable are not satisfied by new paper of the same kind unless so agreed. This rule applies to checks and drafts, and, though they are in general use in the transfer of money from one person to another, payment thereby is deemed conditional on the drawee's acceptance and payment by the great weight of authority. See cases collected in 22 Am. & Eng. Ency. of Law (2d Ed.) 550. Checks, drafts, and other bills of exchange are the means of transferring the money in adjusting nearly all commercial transactions, and in authorizing

5. PAYMENT: authority of agent to accept draft or check.

an agent, whether a bank or individual, to make collections, it may be assumed in the absence of instructions to the contrary that the authority is to be executed in the manner usual and customary in the commercial world. While the agent may not accept anything but the actual cash in satisfaction of the claim, he may receive a check or draft, negotiable and payable on demand, which he has good reason to believe will be honored upon presentation, as a ready and more convenient means of obtaining the money in conditional satisfaction of the debt. Such a payment offers no greater temptations to the agent than payment in cash to which ordinarily it is equivalent. If honored by the drawee, payment relates back to the time of delivery. If not honored, the creditor has parted with nothing by reason of conduct of his agent; for, though the agent may receive such paper as conditional payment, he is not permitted, on its strength, to deliver conveyances, leases, or other valuables at the risk of his principal. *Pape v. Westcott,* 1 Q. B. (1894); *Pearson v. Scott,* 9 Ch. Div. (1878) 198.

In the former case it was said by Lindley, L. J., that " if an agent is merely to collect money, taking a check from a person having a banking account is not a departure from his authority; that is, in the ordinary case of collecting money. If the check is not paid, the person who gives it can be sued; and in ordinary cases no one is prejudiced by taking a check. But it is by no means always within an agent's authority to take a check instead of money. Let us take a case that lawyers are familiar with — the sale of real property. Let us take the case of a solicitor who is intrusted by the vendor with the completion of the transaction. Is that solicitor justified by the ordinary course of business or the ordinary habits of men in parting with the conveyance and title deeds in exchange for a promise to pay or a check? Certainly not." There the agent had upon the receipt of a check for arrears in rent delivered license permitting an assignment of the lease, and upon its

nonpayment was held liable. See, as to custom, *Sweeting v. Scott,* 7 C. B. (N. S.) 148. In *Bridges v. Garrett,* L. R. 5 C. P. (1869) 451, the deputy steward, Craig, was authorized to collect a fine payable to the lord of the manor on admission as a tenant to the copyhold thereof. The defendant drew a check to Craig for the aggregate amount of the lord's fine, the steward's fees and Craig's own charges as defendant's solicitor. The check was crossed with the name of Craig's bankers in London, and on the same day Craig paid it in there to the credit of his own private account. The check was paid and credited to Craig, but as he had overdrawn none of the proceeds were turned over to the plaintiff. Cockburn, C. J., in determining the case, said: "There is no doubt that, where an agent is authorized to receive money for his principal, he cannot allow it by way of set-off in accounts between the payer and himself. He must receive it in money. If, however, payment is made by check, and the check is duly honored, that is a payment in cash. There is nothing in the circumstances of a check being given which invalidates the payment. The present case, however, is a little complicated by the fact of the check having been crossed. It appears that the defendant, at Craig's request, crossed the check with the names of Craig's bankers. Craig's bankers got the check cashed, and carried the amount to the credit of Craig's account with them. If Craig's account had not been overdrawn, he would have had the money. The check, therefore, was in point of fact money. It was the same thing as if the defendant had paid the amount to Craig in cash, and Craig had paid in the cash to his account with his bankers, and had forwarded his own check to the lord or to the steward, and the bankers had, in consequence of the balance being against him, declined to honor his check. If Craig was authorized to receive the money, I think the payment to him was a payment to the plaintiff, and that there was nothing in the mode of payment to take the case out of the ordinary rule."

Blackburn, J., in the same case observed that, " where the person to whom the money is paid stands in the relation of a clerk or servant, the payment to him, whether in cash or by a check which is afterwards paid, is a good payment to the principal." See *Hadley v. Hadley,* 67 Ch. D. (N. S.) 694. In *British & American Mortgage Company v. Tibballs,* 63 Iowa, 468, the payment was by certificate of deposit in the collecting agent's bank, and in holding that this was payment the court said: " Courts take judicial notice of the general customs and usages of merchants and of whatever ought to be generally known within the limits of their jurisdiction, such as matters of public history affecting the whole people (1 Greenleaf on Evidence, sections 4, 5, 6); and we think that the system by which nearly all the banks in this country transact monetary affairs by the use of checks, drafts, and certificates of deposit, and without the actual handling of bank notes or coin, is so well known and understood that no business man, much less a company whose sole occupation is loaning money, should be allowed to profit by pleading ignorance of it." See *Francis v. Evans,* 69 Wis. 115 (33 N. W. 93.) In *Harbach v. Colvin,* 73 Iowa, 638, it was held that while an agent or attorney has not, in the absence of special instructions, any authority to receive anything but money in payment of a claim held by him for collection yet where he receives a bank check as such payment and obtains credit on his account for the amount of the check at the bank where he deposits, and the money is paid him when he chooses to draw it out and the bank on which the check is drawn pays it when presented, this is equivalent to payment in money and binds the principal. See *Harrison v. Legore,* 109 Iowa, 618; *Shay v. Callanan,* 124 Iowa, 374. In *Hunter v. Wetsell,* 84 N. Y. 549, (38 Am. Rep. 544), the court held that the delivery of a check which was subsequently paid was payment at the time delivered within the statute of frauds of New York. See, also *Lineweaver v.*

*Slagle,* 64 Md. 465 (2 Atl. 693, 54 Am. Rep. 775); *Barnett v. Smith,* 30 N. H. 256 (64 Am. Dec. 290); *Tiddy v. Harris,* 101 N. C. 589 (8 S. E. 227); *Strong v. Ten Cent, etc., Ass'n,* 189 Pa. 406 (42 Atl. 46.)

There is *dicta* in numerous cases to the effect that the delivery of a check or draft which is subsequently honored constitutes payment; but few decisions directly pass upon the point. The adjudicated cases generally concern transactions in which such papers have been dishonored. In view of the universal custom of using drafts and checks as a means of payment, we think an agent may receive a draft or check as conditional satisfaction of the claim placed in his hands, unless instructed to the contrary, whenever he has good reason to believe that it will be paid upon presentation. In the case at bar the bank was required by Erskine to remit the money to him in North Carolina, and the evidence shows that this was expected to be done by the ordinary bills of exchange. He was charged with knowledge of the general custom in the matter of collecting notes and mortgages, such as those sent to the bank, and must be assumed, in the absence of other instructions, to have intended that the bank should execute the duty imposed upon it in the usual and customary way. This being so, it is not necessary to inquire how the bank disposed of the drafts. It was equivalent to money and could have been used as such by his agent, and was no more likely to be misappropriated by the officers of the bank than had money been paid instead. We are of opinion that, under the circumstances disclosed, the bond and mortgage were satisfied by the delivery and subsequent payment of the draft.

It is urged, however, that the plaintiff has failed to show such an interest in the land as entitled him to satisfy the mortgage thereon. The appellant's statement that this point was not made in the district court is not denied, and is somewhat confirmed by the opinion of the judge, found in the abstract.

6. APPEAL: questions not raised below.

Plaintiff had been requested previously by the bank to pay the interest and had remitted it to the bank.   Such payment was fully ratified by Erskine.   Indeed, his attorneys insist in their arguments that, because of such payment, the coupon is not involved in this case.   Having accepted payment of the interest coupon, attached to the bond, they ought not now to insist that the same party might not pay the bond, especially when requested by Erskine's agent to do so.   In view of these circumstances, we are inclined to think that Erskine ought not to be allowed to raise this question on appeal.

The decree will be reversed, and the relief in the petition awarded.— *Reversed.*