BENTON CO. SAVINGS BANK, Appellee, v. FIRST NATIONAL BANK OF LAKE MILLS, IOWA, Appellant.

Banks and banking: AGENCY: FRAUD: EVIDENCE. In this action for money had and received by means of the alleged purchase by the plaintiff bank from the defendant bank of certain forged and worthless notes, the business having been done by the president of the defendant bank wholly by correspondence, the evidence is

reviewed at length and held to support a finding that the plaintiff bank was led to believe that the president of the defendant bank was acting for his bank, rather than for himself individually, in all of the transactions, and that the decree awarding judgment to the plaintiff was proper.

*Appeal from Winnebago District Court.*—Hon. J. F. CLYDE, Judge.

WEDNESDAY, APRIL 9, 1913.

ACTION to recover for money had and received by defendant to plaintiff's use growing out of the alleged purchase by plaintiff from defendant of certain forged and altered notes; and of another note, which was genuine, but which, it is claimed, defendant falsely represented as good and signed by a responsible maker. Defendant denied that it sold plaintiff any notes, alleged that its purchases were made from one Joice, who received the entire consideration therefor, and that defendant is in no manner responsible for the sale. It further says that Joice indorsed the same personally, and that defendant had no interest therein, and is in no way responsible therefor. It further denied all allegations of the petition. Upon the issues thus tendered, the case was tried to the court as in equity, resulting in a judgment for plaintiff, and defendant appeals.—*Affirmed.*

*Dunn & Carlson* and *Oliver Gordon,* for appellant.

*Redmond & Stewart* and *B. J. Thompson,* for appellee.

DEEMER, J.—Plaintiff is a state bank, doing a general banking business at the town of Norway, and defendant is a national bank, doing business at Lake Mills, in Winnebago county. At all times material to our inquiry one P. M. Joice was the president and active manager of the defendant bank, and one J. H. Pickart was cashier, and had the active manage-

ment of the plaintiff bank. These officials had no personal acquaintance, but did business with each other, either as agents for their respective banks or individually, or individually on the part of Joice and officially by Pickart for some time during the years 1907, 1908, 1909, and 1910. Practically all, if not the whole, of this business was done by correspondence and as a result thereof plaintiff purchased, either from the defendant bank or from Joice personally, some false and spurious notes, and was induced to take another, which was worthless, but which, it was represented was signed by a man who had three hundred and twenty acres of land "ten miles from Lake Mills, and worth over $10,000 net." It is alleged that this representation was false and untrue, and known by the person making it to be false and untrue at the time it was made.

The negotiations with reference to the notes opened with a letter written on bank stationary bearing the defendant bank's letter head, as follows: "April 16, 1907. J. H. Pickart, Norway, Iowa—Dear Sir: I have two notes as follows: One for $3,000 due January 10th drawing 7 per cent. and another for $2,500 due November 10th drawing 7 per cent. Can you use these on my guarantee on a six per cent. basis? The paper is perfectly good. Yours very truly, P. M. Joice, President." Doubtless in response to a statement that plaintiff would take the $3,000 note, this letter was written by Joice: "April 25th, 1907.    J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: . . . I now enclose note, N. Jessen, dated April 10, 1907, due January 10, 1908, at 7 per cent. interest from date, with my personal guarantee which you are to carry at 6 per cent. interest. Kindly remit $3,000 to the Continental National Bank of Chicago for the credit of the First National Bank of Lake Mills, Iowa, and please remember to send this note to me or notify me at least ten days before due and I will have this remitted for without any exchange or charge of any kind to you. Yours very truly, P. M. Joice." Parenthetically we may say that all the correspondence down to January 10,

1910, was written on letter heads of the defendant bank. Pursuant to request, plaintiff directed the Continental Bank of Chicago to charge its account with the $3,000 and the Continental Bank charged plaintiff bank with the sum of $3,000, and credited the same to defendant bank, and upon advice of such credit defendant bank debited the Continental Bank with this amount, and at the same time credited on its books the amount thereof to the individual account of Joice. Of this latter fact plaintiff bank had no knowledge, however. On April 27, 1907, the following letter was written plaintiff's cashier: "April 27, 1907.   J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: I take the liberty to enclose you note, Nels Larson, dated January 15, 1907, $2,000 due December 15, 1907, with my guarantee. If you can use this on a six per cent. basis, please remit $2,000 to the Continental National Bank of Chicago, for the credit of the First National Bank of Lake Mills, Iowa, and I will pay you six per cent. interest from this date until the note is due and remit for the same without any expense of any kind to you. Yours very truly, P. M. Joice, P." This proposition was accepted, and the proceeds went the way of the other note. Another note was negotiated some time in July of the year 1907, and plaintiff bank sent a draft for the amount thereof directly to Joice. Joice deposited the amount thereof with his bank, and also credited his individual account with the same amount. The draft was indorsed by Joice and by the First National Bank of Lake Mills.

The notes, so far referred to, were all genuine, and were apparently made payable to Joice, who indorsed and guaranteed the same. Several other letters passed between the parties between this date and the next letter, with reference to partial payments, etc., and on May 26, 1909, the following letter went to plaintiff's cashier: "May 26, 1909. J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: I have just been going over some unfinished stuff and I find your several letters among this lot. I would now like to clean up the whole busi-

ness and get everything squared away. In your last letter of March 16th you say for me to send you renewal of the Jessen $2,000 note and the Larson note $500.00 and draft for interest. I now inclose renewal of the Jessen note, dated to-day $2,000 due September 15, 1909, drawing 7 per cent. interest from this date. As I understood the matter we are to pay you 6 per cent. interest from the date of the note up to this time. I also take the liberty to inclose you note, Jacob P. Ramsey, $2,500.00 dated to-day, due November 15th, interest at 8 per cent. I would like to have you take this note on a 7 per cent. basis net to you and figure up the Larson note, also the interest on the Jessen note and make me a *complete statement of the whole* business by early mail so I can get this thing cleaned up. I am very sorry, Mr. Pickart, that this matter has been allowed to run and that we have caused you so much annoyance, but I want to fix the matter up now with you satisfactorily and get things squared up to date. If it is not convenient for you to take the Ramsey note then I will send you draft for the amount due you but it would be an accommodation to us now if you could take the enclosed paper; the understanding, as I look at it, is that you people are to have 6 per cent. interest up till now and we will allow you 7 per cent. interest from this time on the enclosed paper. *I trust you can find time to dig up this old account right away so I can get it properly booked here before June 1st.* Yours very truly, P. M. Joice, President." Inclosed with the letter was a note purporting to be signed by Nordahl Jessen for $2,000, dated May 26, 1909, payable to Joice or order, and by him indorsed and guaranteed; also another note of one J. P. Ramsey for $2,500, payable to Joice or order, and by him indorsed and guaranteed, and with this letter the following statement attached to the Ramsey note: "J. P. Ramsey has three hundred and twenty acres improved farm ten miles north of Lake Mills and is worth over $10,000 net. P. M. J." The Ramsey note was genuine, but the property statement is shown to have been false, when made, and that Ramsey was, in fact,

insolvent. Assuming the Ramsey note to be good, plaintiff from the amount thereof credited $1,158.31 upon the original Jessen and Larson notes, and sent the balance, $1,341.69, in a draft to P. M. Joice. Joice turned this draft over to his bank, and took credit therefor personally. The signature to the last Jessen note, above referred to, was a forgery, and doubtless Joice was the author thereof. There is due thereon the sum of $1,500 and interest, and on the Ramsey note the sum of $2,000, with interest. On June 26, 1909, Joice wrote plaintiff's cashier as follows: "June 26, 1909. J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: Inclosed find two notes as follows: T. O. Stensrud $2,000 dated June 26, 1909, due December 1, 1909; H. I. Oppedal $2,200 dated June 15, 1909, due October 20, 1909, with ratings attached personally guaranteed by P. M. Joice. If you can use this paper to net you 6½ per cent. please remit $4,200 to the Continental National Bank of Chicago to the credit of the First National Bank of Lake Mills and we will allow you 6½ per cent. from the date of your remittance and will endeavor to take care of the paper promptly. Yours very truly, P. M. Joice, President." The notes therein referred to were inclosed and purchased by plaintiff. The Stensrud note was genuine, and has since been fully paid. But the Oppedal note was a forgery, although $1,000 was paid thereon, on November 22, 1909, and $700 on November 22, 1910, leaving a balance of $500 due on this note.

In payment for these notes plaintiff bank remitted $4,200 to the Continental Bank of Chicago for the credit of the defendant bank, and on July 6, 1909, upon receiving credit advices from the Chicago bank, this amount was charged to that bank upon the books of the defendant bank, and the same amount thereafter credited to the individual account of Joice; of this latter transaction plaintiff had no knowledge. It appears that none of the notes which plaintiff bank purchased was ever entered upon the books of the defendant bank, and they did not bear the bank numbers—of neither of these facts

had plaintiff any knowledge; but it is claimed that the latter circumstance should have given plaintiff's officers notice that it was not dealing with paper belonging to the bank. On August 3, 1909, Joice's account with his bank showed a small balance in his favor, but this was shortly withdrawn and became permanently overdrawn on April 13, 1910. On June 9, 1909, some irregularities were discovered in Joice's management of his bank, and one of the directors thereof was placed in the bank to act as a check upon him (Joice), and it also appears that on August 6, 1909, Joice conveyed a large amount of property to this director to indemnify the bank upon his liability to it as borrower, indorser, or otherwise. Joice continued to act as president of his bank until about January 18, 1910, when he was deposed, and has since died, leaving no assets.

Plaintiff brought this action to recover the amounts advanced by it on the Ramsey, the Jessen, the Larson, and Oppedal notes, amounting in the aggregate to $4,307.54 and 6 per cent. interest thereon from December 1, 1910. Defendant denies all liability on any of the notes for the reason that the entire transaction was with Joice personally, and not with the bank; that it had no notice or knowledge of Joice's negotiations of the notes and no authority as a national bank to indorse, guarantee, or in any manner become responsible upon Joice's notes and papers.

The questions presented are largely of fact, with the rules of law very well settled, although counsel do not agree in the application of these rules. The initial inquiry is, Were the transactions in question or any of them personal with Joice, or were they with Joice for and on behalf of his bank, the defendant herein? It will be noticed in the first place that Joice himself was not personally acquainted with any of the officers or directors of the plaintiff bank, and that the correspondence was begun by a letter signed by Joice as president of the defendant bank. Again, until Joice left the bank in January of the year 1910, all his correspondence with

plaintiff was upon letter heads of the defendant bank, and as a rule, subject to very few exceptions, Joice signed his letters as president of the bank. Moreover, as a rule, the amount paid by plaintiff for the notes was passed to the credit of the defendant bank through its correspondent in Chicago and thereafter passed by Joice to his personal credit upon the books of the defendant without knowledge of the plaintiff or any of its officers. Again, in most of the correspondence, Joice refers to his bank and speaks both in a representative and a personal capacity, and another significant fact is proof of a custom on the part of Joice to handle bank paper in the manner the testimony shows that he did in this case. Another circumstance which should be considered is that when payments were made upon any of the notes purchased by plaintiff bank, whether genuine or spurious, they were by drafts of the defendant bank, which drafts, it is true, were issued to Joice and by him indorsed to plaintiff bank.

As against these and other circumstances in the record tending to show that all the transactions in question were with defendant bank, or with Joice, as a representative of the bank, defendant contends that the correspondence shows that plaintiff was dealing with Joice individually, and not as an officer of the bank; that in some cases it remitted to Joice individually for the notes; that as the notes did not bear any bank number plaintiff had notice that the transactions were not with the bank, but with Joice individually; that plaintiff had a special and individual contract with Joice as to the interest charges, which fact put it upon inquiry as to the actual ownership of the notes; that after it discovered the spurious character of some of the notes, and after Joice left defendant bank, it wrote to Joice, demanding payment, thus recognizing that the deals were with him (Joice) individually; that defendant bank had no knowledge whatever of the transactions save as it might be implied from the fact that Joice was its agent, but that notice will not be implied under such circumstances because of the fraud perpetrated

by Joice. These and other matters are relied upon to show that defendant bank is no way responsible for the acts of Joice.

In this connection, we may well quote the rules of law applicable to such circumstances as announced in the recent case of *State v. Bank,* 139 Iowa, 338, as follows:

The several notes and warrants were negotiated by La Rue as president of the Corning bank. That he acted with such apparent authority that the bank was bound thereby appears from *Griffin v. Erskine,* 131 Iowa, 444, and *Martin v. Webb,* 110 U. S. 7 (3 Sup. Ct. 428, 28 L. Ed. 49). La Rue, though president, was the chief executive officer of the Corning bank, and the Des Moines bank had the right to rely upon him as representing his bank in negotiating the paper. It may be that he appropriated the proceeds of these notes (probably he did); but that was not the lookout of the Des Moines bank. It dealt with him as an officer and representative of the Corning bank as it had the right to do, and without notice of any want of fidelity in the discharge of his duties as its executive officer. Having armed him with apparent authority to represent it in transacting business appropriate to the proper discharge of its corporate functions, the bank or the receiver standing in its shoes cannot be heard to complain as against those who in good faith and without notice dealt with him as its representative. In such a case the doctrine obtains that, where one of two innocent persons must suffer through the misfeasance of an agent of one, that one who has placed the agent in a position to perpetrate the fraud must suffer. *City National Bank v. Thomas,* 46 Neb. 861 (65 N. W. 895). It is urged, however, that the condition of the paper was such that in connection with the magnitude of the business intervener was charged with notice. In the light of present knowledge there would be little difficulty in detecting the spurious paper negotiated by La Rue ostensibly for the Corning bank. Thus the numbers on the notes were irregular, the numbers of the later being smaller than those of an earlier date, and others bearing numbers of too great disparity, and there was marked similarity between the signatures attached to the forged paper. But, as the notes were received at different times, the officers of the Des Moines bank, unless their suspicions were aroused, would not be likely

to notice the irregularity in the numbering, or to compare the numbers on each note received with those previously purchased, nor to make such comparison of signatures. Its officers knew nothing of the signatures of the persons whose names purported to be attached to the notes, nor of the Corning bank's system of numbering the same. Necessarily it must have been purchased on the faith and largely in reliance on the representations made. The magnitude of the transactions would not necessarily put the Des Moines bank on inquiry, for each was plausibly and reasonably explained by La Rue.

Going again to the testimony, we are constrained to hold from the letters which we have set forth, from other letters appearing in the record, which are even stronger than those quoted, from the oral testimony given by the officers of the plaintiff bank, that plaintiff believed it was purchasing the notes in question from the defendant bank, acting through its official head and managing officer, Joice; that while it took Joice's personal guaranty this in no manner indicated that it was dealing with him individually; that while it wrote Joice after it became suspicious of the paper, asking him to make the paper good, it had a right to do so, and from such fact no inference should be drawn that it regarded the entire transaction personal with Joice. In this connection it appears that plaintiff also wrote the defendant bank about the same matters.

Another significant fact appearing from the record is that after defendant bank discovered the delinquencies of its president, and after a check had been placed upon his powers, the final transaction with reference to the $4,200 referred to in the letter of June 26, 1909, occurred, and defendant's officers, although cognizant of the transactions or some of them, and with full knowledge that the $4,200 had been placed to the credit of defendant bank with the Continental Bank of Chicago, permitted a transfer of this credit to the individual account of Joice. It was willing to take the money, although it knew plaintiff was advancing it as if it were a bank transaction and to credit it to the account of

Joice, who, it seems, was then under suspicion by the other officers and directors of the bank, and to increase its assets at plaintiff's expense. Within a month it took a conveyance from Joice to secure his liability to the bank, no matter how created. It appears that it was Joice's custom to take notes for the bank in his own name, to negotiate the same for the bank, and to direct how the money should be remitted; and as a rule the procedure was to have a credit made by defendant's correspondent bank at Chicago, or some other place, not in his (Joice's) individual name, but in the name of his bank. After this was done, the account was so manipulated by Joice that he received personal credit therefor; but this was without the knowledge of the purchaser of the papers. It is true that the notes did not have any bank number, but this is by no means controlling, although a circumstance to be considered with others in arriving at the truth.

We have already quoted the first letter with reference to the discount of notes, but the initial correspondence between these parties was a letter of March 8, 1907, written on a letter head of defendant bank, reading as follows: "Lake Mills, Iowa, March 8, 1907. J. H. Pickart, Cashier, Benton County Savings Bank, Norway, Iowa—Dear Sir: Your letter of the 7th received this morning and we inclose our certificate for $3,000. Please remit said amount to the Continental National Bank of Chicago for our credit and oblige. Yours very truly, P. M. Joice, President." This letter clearly refers to a bank transaction, and it was the first matter of business which passed between the two banks. In most instances the purchase price of the notes was passed to the credit of the defendant bank in Chicago as per Joice's directions; but in a few instances the payment was in the form of a draft, sent directly to Joice. Again, on February 28, 1908, the defendant bank, in response to a letter written to it by plaintiff, sent plaintiff the following letter: "2-28 1908. J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: Your letter dated 27th is at hand. Our President Mr. Joice has been giving your matters his

personal attention so I am not familiar with them. He was called to No. Dak. yesterday and will not return until Monday or Tuesday. I trust you will let the matters stand as they are until his return when I will present your letter to him. Yours very truly, J. M. Tapager, A. Cash.'' And this was followed on March 28, 1908, by a letter from Joice reading as follows: ''March 28, 1908.   J. H. Pickart, Cashier, Norway, Iowa—Dear Sir: In reply to your last letter will say that within two or three days after the first of April I think without doubt I will be able to clean up everything we owe you and send you a demand certificate and not have this matter run along any more in this way. Yours very truly, P. M. Joice, President.'' These letters are to our minds quite significant. The representations as to Ramsey's responsibility were false and untrue, and the testimony shows that his name was used for the purpose of floating much other worthless paper. The decree rendered by the district court protects the defendant by ordering the return of this note with some other papers. This part of the decree is not complained of.

After a careful examination of the entire record, we are constrained to hold that the decree of the district court is correct, and that it should be *Affirmed.*