No. 18,438.

COLORADO FEDERAL SAVINGS AND LOAN ASSOCIATION *v.*
SAM N. BEERY, AS RECEIVER OF INTERNATIONAL
INDEMNITY INSURANCE COMPANY.
(347 P. [2d] 146)

Decided November 23, 1959.    Rehearing denied December 21, 1959.

Messrs. YEGGE, BATES, HALL & SHULENBURG, for plaintiff in error.

Messrs. IRELAND, IRELAND, STAPLETON & PRYOR, Mr. JOHN S. KELLOGG, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

THE plaintiff in error was defendant in the trial court. The defendant in error as plaintiff instituted this action for the recovery of the proceeds of a certain deposit in the amount of $10,000.00. Judgment was in favor of the plaintiff and the defendant seeks review and reversal.

On August 4, 1954, the sum of $10,000.00 was deposited in the defendant association to the credit of International Fire Insurance Company. This deposit was made by one Larry Schwab, who was then President of that corporation. About a year later, on August 2, 1955, the defendant association was notified of a change of name of the depositor, International Fire Insurance Company to International Indemnity Insurance Company. This change was requested by Larry Schwab and the change made on the ledger card of the defendant.

The deposit in question was evidenced by a certificate issued by the defendant acknowledging the company to be a member of the Colorado Federal Savings and Loan Association and acknowledging that it holds a $10,000.00

"investment share account." This certificate is transferable on the books of the defendant company. The signature on the card held by the bank was not that of the insurance company, but was merely that of "Larry Schwab."

On January 3, 1956, Larry Schwab, also known as Lawrence M. Schwab, appeared at the defendant association's office and surrendered the certificate to the association, signing it "Larry Schwab, Pr." The certificate was thereupon cancelled and the check of the defendant was issued payable to Larry Schwab in the amount of $10,000.00. Attached to this check was a voucher declaring: "The attached certificate is in full settlement as stated hereon." The check was signed by the Secretary-Treasurer of the defendant association.

According to the evidence, payments to depositors are made in cash or by check as requested and in case of investment deposits such as the present one, the certificate is the sole evidence of the indebtedness.

Larry Schwab testified by means of written interrogatories. He stated that he was President and Treasurer of the International Indemnity Insurance Company and that his wife was Vice President and Secretary of the corporation. He also testified that he and his wife owned all of the stock of this company and that they were the only members of the board of directors during the times in question. He further testified that he invested the $10,000.00 proceeds of the account in United States Government Bonds. There is no evidence to substantiate this assertion and it was assumed at the trial that he converted the proceeds of the check to his own use.

Sam N. Beery was appointed receiver of the International Indemnity Insurance Company on May 24, 1956, and William B. Naugle was appointed as his assistant. Following an audit of the books of the defunct company, a demand was made on the defendant association for $10,000.00 which was refused. Thereupon the receiver

filed a complaint alleging that the International Indemnity Insurance Company had deposited $10,000.00 with the defendant association and that the receiver, as the successor in interest of the insurance company, was entitled to this amount. The defendant association admitted the deposit and alleged that the account was paid to the International Indemnity Insurance Company on January 3, 1956, by delivering the sum in question to Larry Schwab, "the President, General Manager and duly authorized Agent of said * * * company."

Following trial to the court, judgment was entered in favor of the plaintiff in the amount of $10,000.00, together with interest and costs. In reaching its conclusion that the plaintiff receiver was entitled to recover, the trial court stated:

" * * * The rules of the Colorado Federal Savings and Loan Association were that the certificate should be endorsed. The teller said she thought it was endorsed because that was a rule of the company and she didn't see the gentleman sign it. Unfortunately the name appears where the assignment should be but no president — no nothing. The record is not clear why the check was made payable to Larry Schwab only. but it was made payable to Larry Schwab. The Court feels it should not have been made so because the certificate should have been endorsed by the International Indemnity Insurance Company — Fire Insurance Company — and I feel if endorsed by the International Fire Insurance Company by Mr. Schwab it would have been justified in making the check to Mr. Schwab. It was not so done. The Court feels there was negligence on the part of the teller and also negligence on the part of the Secretary-Treasurer because at the bottom of the certificate which she signed put her on notice that it was a certificate of the International Indemnity Insurance Company and not Mr. Schwab.

"The Court feels that plaintiff in this case is entitled to recover the sum of $10,000.00 from the Colorado Fed-

eral Savings and Loan Association, and that is the order of the Court."

In seeking a reversal of this judgment, the plaintiff in error argues:

1. That Larry Schwab had full authority to receive payment of the account on behalf of the International Indemnity Insurance Company and consequently the delivery of the check payable to Larry Schwab and the surrender of the certificate discharged the obligation.

2. That the so-called Scrivener's Rule applies and that the obligation was discharged by reason of the fact that Schwab opened the account, had possession of the certificate, the indicium of ownership of the account, and surrendered this certificate upon receipt of the money.

The case was tried and decided on the theory that the title to the deposit remained in the insurance company because the certificate at the time of its surrender was not signed in the proper place, and that the check was made payable to the agent instead of the principal, and that the plaintiff as successor of the insurance company was thus entitled to collect it on the theory of money had and received.

If there had been something here in the nature of a forgery this title or property argument would be tenable, but the element of forgery is not present. Here the certificate of deposit was surrendered and was discharged on an authorized signature and for that reason the only issue is that of authority of Schwab. If he had the legal power to collect these proceeds the judgment must be reversed.

The exact terms of the certificate are of some importance. It is a large document suitable for framing, the dimensions of which are 12″ x 8″. It is similar in appearance to a stock certificate in color and make-up. It certifies that the person named is a member of Colorado Federal Savings and Loan Association "and holds a ............ dollar investment share account of said association subject to its charter and by-laws and to the laws

of the United States of America." It is signed by an officer of the association. On its reverse side are spaces for the assignment or transfer to third persons. The assignee, according to the terms there set forth, must transfer the title on the books of the association and must himself apply for membership and execute a signature card. It is thus apparent that the document is a non-negotiable certificate of indebtedness, and that it can be surrendered by the owner or holder for cash without completing the spaces devoted to assignments. The rules of the company, according to the testimony, require the holder to indorse the document so that his signature may be compared with that on the signature card. In this instance Schwab indorsed the document by signing his name on the reverse side of the assignment space. This signature was in accordance with that on the signature card and was satisfactory to the defendant association and consequently it cannot be here questioned in support of a contention that title did not pass. This is especially true in view of the fact that the certificate was surrendered and stamped "cancelled." There was substantial compliance with the association's formal requirements for surrender and discharge of this certificate from the standpoint of its character both as a contract and as a piece of intangible property. It follows that the certificate as the indicium of ownership is itself important. 7 *Am. Jur., Banks,* Sections 497, 501, pp. 354-357.

The decisive issue in the case is therefore whether Schwab possessed authority to collect the proceeds of this account or debt owed to his principal and thus to discharge the obligation. The undisputed evidence is that he had actual authority to make the collection and to discharge the debt. Schwab was President, Treasurer and General Manager of the company. His wife was Vice President and Secretary. There were no board members other than the Schwabs, and there were no other shareholders. When asked whether he had au-

thority from the insurance company to cash the account, he answered: "I had complete and absolute authority of the corporation to cash this said certificate in that I had the authority of my wife and myself."

██ Even though there was no formal resolution of the Board of Directors, in view of Schwab's ownership and control of the stock and his control of all of the offices, it would seem that he had actual authority to surrender the certificate and receive the money. See 19 C.J.S. 472, *Corporations*, Sec. 1004. In 2 *Fletcher, Private Corporations,* p. 852, Sec. 666, part 5, the author concludes that a sole shareholder is to be treated as a general manager having all of the broad powers described in Sec. 667 of that volume. In 5 *Fletcher,* supra, Sec. 2099, the author states:

" * * * However, the modern weight of authority seems to support the proposition that the contracts of the sole shareholder, or all the shareholders, will bind the corporation, although not made by authority of the board of directors, since they are the only persons beneficially interested aside from corporate creditors. * * * "

See also *Fuller, The Incorporated Individual: A Study of the One-Man Company,* 51 Harv. L. Rev. 1373 (1938), and see *Renault v. L. N. Renault & Sons* (1951), 188 F. (2d) 317, and see *Mutual Assur. Co. v. Norwich Sav. Soc.,* 128 Conn. 510, 24 A. Rep. (2d) 477, where it was said:

" * * * There can be no question that it was within his authority to draw funds from the defendant bank and to that power the waiving of the bylaw requiring presentation of the deposit book and the signing of an order was but an incident. Had he not been connected with the defendant bank but, representing the plaintiff, had been permitted by the bank to withdraw the money from the account without presenting the deposit book, there would be no question that the requirement that it be presented was waived and the withdrawal would

have pro tanto discharged the indebtedness of the defendant to the plaintiff. * * * "

■ Considered from the standpoint of the defendant association, Schwab also had apparent authority to receive payment. He had created the account, had signed the signature card in blank and he had possession of and surrendered the indicium of ownership. See *Restatement of the Law of Agency*, 2nd Ed., Sec. 72.

■ The fact that the check of the defendant association was made payable to Schwab personally rather than to the insurance company is not important in the light of our holding that Schwab had actual authority to receive payment. This is merely a question of what constituted the authorized medium of payment. Undoubtedly, the defendant association could have discharged its indebtedness by delivery of currency. Had this course been followed, neither the insurance company nor its successor could have raised any objections whatsoever since this is generally regarded as a proper medium of payment. Therefore, the issuing of a check payable to the agent Schwab cannot be objected to in view of the fact that the check was ultimately paid. See *Restatement*, supra, Sec. 72, and see also 2 *Am. Jur.* 133, Sec. 165, *Agency*. A note in 94 A.L.R. 784 explores with some thoroughness the legal effect of payment to an agent by check, which check is ultimately paid. At p. 786, the author states:

"The view that a principal is bound by the act of his agent in taking something other than cash where cash is actually realized on the thing taken has been quite generally adopted in cases where the thing taken was a check. While it is generally recognized that an agent having authority to collect a debt has no authority to receive a check in payment, it is nevertheless held that, where he cashes the check and receives the money thereon, the principal is bound."

Representative cases which are there collected and which support the view which we here approve are

the following: *Harbach v. Colvin* (1887), 73 Iowa 638, 35 N.W. 663; *Zummach v. Polasek* (1929), 199 Wis. 529, 227 N.W. 33, and *International Sponge Importers v. Andrew Watts & Sons* (1911), A.C. (Eng.) 279, and *Potter v. Sager* (1920), 228 N.Y. 526, 126 N.E. 920.

In the *Harbach* case an attorney had possession of his client's mortgage and received a check in payment of the indebtedness. This check was deposited in his bank to his credit and was subsequently paid by the bank on which it was drawn. The attorney failed to remit the proceeds to his client. The Iowa Court said:

" * * * We have no occasion in the present case to determine whether such agent would have authority, where the usage was to pay by check, to accept a check in payment, but for the purposes of the case, it may be conceded that he would not have such authority. If, however, he receives the money on a check which he has taken in payment, there can be no question that that would amount to payment. If the debt should not be satisfied by the acceptance of the check, it clearly would be by the receipt of the money thereon. Now, while the money was not actually delivered to Creighton on the check, what was done was equivalent to that. The bank in which he deposited it gave him a credit for the amount, and paid it to him when he chose to draw it out, and the bank upon which the check was drawn paid the amount when the check was presented."

In the *Zummach* case the agent also converted his principal's money and it there appeared that the payments were made to him by checks. The Wisconsin Court said:

" * * * The trial court correctly held that payments made to Biersach by check payable to his order, which checks were cashed by Biersach, were no different than payments made in cash or in checks payable to 'cash' so far as the legal effect of the transaction was concerned. It is true that ordinarily an agent to collect has power to receive nothing but cash unless a general custom that

something else may be taken in lieu of cash is shown, yet, where the checks are in fact cashed by the agent, the principal is bound. Griffin v. Erskine, 131 Iowa, 444, 109 N.W. 13, 9 Ann. Cas. 1193."

In the *International Sponge* case the English High Court upheld a payment to a faithless agent notwithstanding that the debtor had been expressly advised that the Sponge Company required payments in checks made out to itself. This decision was based upon a course of dealing which deviated from the express instructions.

In *Potter v. Sager,* supra, the Court there said:

"Where a person is an agent, with authority from his principal to collect principal and interest, the general rule is that a payment by a debtor to such agent, to constitute a good payment, must be made in cash. The reason for this rule is that a payment in any other medium is not as good as cash — is not the exact equivalent of cash. Thus it has been held that the giving of a note, mortgage, postdated check, property, etc., does not constitute a payment, because the acceptance of those things by the agent exceeds his authority, and constitutes the exercise of a discretion by the agent not vested in him by his principal.

"It would seem, however, that this court should take judicial notice of the fact that checks and drafts are usual and ordinary means of transacting business and transferring money in all business transactions; that, where an agent is given authority to collect money, the authority granted implies that he shall do so in the usual and ordinary way, and, where a check is given by the debtor, not postdated and payable at a bank in the same city, the giving of such check, payable to the agent, constitutes payment from the time that such check is cashed in due course."

See also *Bartholomew v. Emerson-Implement Co.,* 68 Colo. 244, 187 Pac. 538.

In view of our conclusion that Schwab had authority

to receive the money and that the check payable to him was a proper medium or means of payment, it follows that the money that Schwab realized from the deposit in his own account was the money of the International Indemnity Insurance Company rather than the money of the defendant association. Therefore, the conclusion of the trial court that the payment to Schwab was not justified and that the account remained intact was erroneous.

The judgment is reversed and the cause remanded with directions to vacate the judgment and dismiss the complaint.

MR. JUSTICE HALL and MR. JUSTICE FRANTZ dissent.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion. I refer to the plaintiff in error as the Loan Co. and to the defendant in error as the Insurance Co.

The record is very brief. The Loan Co. admits that it received a deposit of $10,000.00 from the Insurance Co., which at the time the deposit was made was known as the "International Fire Insurance Company," and for answer to the demand by the Insurance Co. the Loan Co. states that said $10,000.00 was paid to the Insurance Co. "by delivery of said sum to Larry Schwab, The President, General Manager, and duly authorized agent of said International Indemnity Insurance Company."

The majority opinion states that:

" * * * The decisive issue in the case is therefore whether Schwab possessed authority to collect the proceeds of this account or debt owed to his principal and thus to discharge the obligation * * *."

The majority opinion finds that Schwab was possessed of such authority; the finding that such authority existed is predicated on facts which are alleged to appear in the record. I am not in entire accord as to some of the deductions made by the majority as to the force and effect of certain testimony.

Bearing in mind that Schwab and the Insurance Co. are two separate and distinct legal entities, now let us see what evidence there is of Schwab's authority to discharge the debt.

1. The majority, in finding Schwab had authority to withdraw the deposit, apparently attach some significance to the fact that he had created the account. It does not follow that one having authority to make deposits has authority to make withdrawals.

" * * * a mandate [by a principal] to deposit money in a bank does not imply a power to draw it out * * *." —2 C.J.S. 1288 §108.

2. The majority opinion, in speaking of Schwab and his wife, states: "There were no * * * other shareholders." The only evidence in the record with reference to this matter is found in the deposition of Schwab, which deposition was offered in evidence by the Loan Co. The whole of the testimony touching such question is as follows:

"6. Who were the stockholders in said insurance corporation throughout January, 1956? Answer: There were no other stockholders in January, 1956, other than my wife and myself.

"7. Approximately what proportion of the total issued stock of said insurance corporation was held by you and your wife during January, 1956? Answer: *All but those shares* necessary to keep the company a corporation." (Emphasis supplied).

Ownership of stock does not establish any semblance of agency. That relationship is one existing between a corporation and its stockholders. Stockholders as such have no authority to act for or in behalf of the corporation or to bind it in any respect.

3. It is stated in the majority opinion that Schwab was president and treasurer, that his wife was vice-president and secretary. It is a fair inference that officers have some powers; they have such powers (as officers) as are provided in the bylaws, and of course that

covers the power to do those things necessary and incidental to carrying out the general powers expressly granted. We have no bylaws of the Insurance Co. before us; consequently there is no evidence as to what, if any, powers any officer possessed.

4. Next it is said that:

"There were no board members [directors] other than the Schwabs [husband and wife]."

The only evidence in the record on that question is found in the deposition of Schwab.

"4. Who were the Directors of said insurance corporation throughout January, 1956? Answer: In January of 1956, Irene G. Schwab and Lawrence M. Schwab were the sole directors of the International Indemnity Insurance Company.

"5. Were there any officers of said insurance corporation at any time during January, 1956, other than you and your said wife? Answer: There were no other *active* directors of the International Indemnity Insurance Company, other than my wife and myself." (Emphasis supplied).

Directors, as such, are not agents of the corporation; there is no relationship of principal and agent. A director, provided for by charter or bylaw, is without authority other than to act as a member of the board in the management and operations of the corporation — alone he has no authority to bind the corporation; no two, acting individually, have any such authority. The board functioning as a board does have the responsibility and the power of running the affairs of the corporation.

In 19 C.J.S. 85, §745, it is said:

"According to the general rule, usually recognized, the directors possess authority to act only as a board at a regularly assembled meeting; the individual and separate action or assent of directors does not bind the board or corporation, nor is it the act of the board or of the corporation. * * *."

In the case before us, it does not appear that directors

ever met, nor how many made up the board. C.R.S. '53, 72-1-43, sets forth how the business of an insurance company shall be conducted:

"The business of insurance companies heretofore or hereafter incorporated under the laws of this state shall be managed by a board of directors consisting of such number of directors, not less than three, as may be prescribed by the articles of incorporation or any amendment thereof, * * *. Such directors shall be nominated and elected in the manner prescribed by the bylaws of the company not inconsistent with the laws of this state."

5. It is next stated by the majority that Schwab was the president and treasurer. As such officer he was not an agent; there was no relationship of principal and agent.

In 19 C.J.S. 97, §752, it is said:

"Aside from his position as presiding officer of the board of directors and of the stockholders when convened in general meeting, the president of a corporation has, by virtue of his office merely, no greater power than that of any director. Whatever authority he has must be expressly conferred on him by statute, charter, or by by-law or the board of directors or be implied from express powers granted, usage or custom, or the nature of the company's business. * * *."

The fact that Schwab's wife was a stockholder, director and officer cannot serve to enlarge upon the powers of Schwab.

6. Next it is said that Schwab "was the general manager of the company." The only evidence in the record touching on this question is found in the deposition of Schwab.

"2. Please state what person, during January, 1956, was in active management and control of the affairs and business of said insurance corporation. Answer: I was *active in the management* and controller of the affairs of

the business of said corporation as of January, 1956."
(Emphasis supplied).

I question whether such statement supports an asser-
tion that he was the general manager. However, let us
assume that he was the general manager.; holding such
position in itself does not clothe him with authority to
surrender corporate assets in return for a check made
payable to himself. I am of the opinion that a manager,
limited or general, is an agent; he acts in behalf of the
corporation, his principal; he may be a director as well
as manager. The manager gets his authority from the
board of directors; the directors get their authority and
have their duties fixed by statute, charter or bylaws.
Whatever managerial powers Schwab may have had
were necessarily conferred upon him by the board of
directors; there is nothing in the record to indicate the
extent of the powers conferred, if any.

7. It is stated in the majority opinion that Schwab
said:

"I had complete and absolute authority of the corpora-
tion to cash this said certificate in that I had the author-
ity of my wife and myself."

This is a *forceful inadmissible conclusion of law of
Schwab* which, if accepted, constitutes an ajudication of
the matters involved and renders further consideration
by the court a waste of time and energy. Significantly
there is nothing in the records to indicate the source of
this power. In any event, this statement cannot serve
as proof of agency or the scope of the power. It is well
established that such may not be proven by the testi-
mony of the agent. Typical of dozens of pronouncements
of this court is the following statement from *Commercial
Ins. Co. v. Rinn,* 100 Colo. 76, 65 P. (2d) 705:

" * * * Of course no assumption and no declaration
of alleged agents, standing alone, can bind the principal.
*Lester v. Snyder,* 12 Colo. App. 351, 356, 55 Pac. 613.
Franklin says Connors represented the company. Rinn
says Connors was its 'agent' and 'general agent' and that

Alexander was its 'general attorney.' These statements are mere conclusions. *Stuart & Co. v. Asher,* 15 Colo. App. 403, 406, 62 Pac. 1051; 90 A.L.R. 756. * * *."

8. What other evidence was there of Schwab's authority? When he made the deposit, he apparently signed a form of application prepared and furnished by the Loan Co. It states it is an application of International Fire Insurance Company" for membership, etc. Following the application are four lines, each preceded by the word "Signature," and opposite each following the word "Office" is a blank line. On the top line appears the signature "Larry J. Schwab"; on the reverse of this card is a form of resolution to be signed by the secretary of the corporation in which the secretary, among other things, certifies as follows:

"IT IS HEREBY CERTIFIED that the above named officers have been duly elected to the offices set opposite their respective names, that they hold such offices at this time, that their true signatures appear on the reverse hereof, and that the above resolution is not a violation of our articles of association or by-laws and was duly adopted at a meeting of the board held on the ............. day of ......................, 19........."

In the center of this card are four lines for the insertion of names, and opposite each line is the word "Office" and another line. The signature of Larry J. Schwab appears on the top line — nothing more. The secretary of the corporation did not sign nor did any other person sign the above certificate.

On an account card kept by the company showing the deposit in the name "International Indemnity Insurance Company," also showing dividends and withdrawal of $10,000.00, appears the signature "Larry Schwab." On the reverse side of the certificate of deposit there is a form for transferring the account and membership. The name "Larry J. Schwab, Pr." appears in the line designated as the place for inserting the name of the assignee. The portion provided for execution by the Insurance Co.,

payee and assignor, remains blank. How can it be said that signing one's name four times is proof of any authority? All such signing could well be without any authority. Doing an act is no proof of authority to do it.

9. Apparently the majority consider as some evidence of authority to cash the certificate and take a check in his own name the fact that the Loan Co. was notified of a change in name of the depositor, and the majority opinion states:

"This change was requested by Larry Schwab and the change made on the ledger card of the defendant."

I do not believe the record supports the statement that this request was made by *Larry Schwab*. Defendant's Exhibit F is a letter written on printed stationery of International Indemnity Insurance Company; it is dated August 2, 1955, directed to the Loan Co., requests the change, and is signed:

"International Indemnity Insurance Company, Larry Schwab, President."

I doubt if that can with propriety be called a request of Larry Schwab. Apparently the Loan Co. took the same view of the request as I do, for in response to this request it directed a letter (Exh. G) dated August 4, 1955, not to Larry Schwab, but to:

"International Indemnity Insurance Company,
901 Sherman Street,
Denver, Colorado
Gentlemen:"

10. It cannot be contended that Schwab was clothed with apparent authority. The record discloses that none of the Loan Company's witnesses had any recollection of ever seeing Schwab, though they opined that he must have been in their place of business.

I fail to find in the record or in the opinion any facts to prove that Schwab was an agent or officer empowered to surrender this certificate in exchange for a check payable to himself personally. A debt is discharged by payment made to the creditor. The Loan Co. did not

even purport to pay the Insurance Co. In addition it was guilty of a violation of its own bylaws, bylaws pursuant to which the deposit was received, bylaws made an integral part of its certificate, bylaws defining the rights and duties of the parties and upon which each was entitled to rely.

Article 6 of the bylaws of the Loan Co. (Exh. H) provides:

"6. Withdrawals—The association shall have the right to pay the withdrawal value of its savings accounts at any time upon application therefor and *to pay the holders thereof* the withdrawal value thereof. *Upon receipt of a written request from any holder* of a savings account of the association for the withdrawal from such account of all or any part of the withdrawal value thereof, * * *." (Emphasis supplied.)

Clearly this bylaw, a part of the contract, contemplated a written request from the holder — the Insurance Co. — before making any payment. It had no written request from the holder or any other person.

The following statement from 2 Am. Jur. 80, §98, is particularly applicable to the fact situation as evidenced by this record:

"Every agency is subject to the legal limitation that it cannot be used for the benefit of the agent himself, or of any person other than the principal, in the absence of an agreement that it may be so used. This is a rule of law of which all persons must take notice. Whenever it appears that the interests of an agent and those of his principal are necessarily in opposition in a particular transaction, strangers dealing with the agent are charged with notice of his want of authority to bind the principal by his acts. * * *."

The judgment of the trial court should be affirmed.

Mr. Justice Frantz joins in this dissenting opinion.